IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>MARK ALLEN FANDEL,<br><br>    Defendant. | No. 12-CR-3009-CJW-MAR<br><br>MEMORANDUM<br>OPINION AND ORDER |

## I.    INTRODUCTION

This matter is before the Court on defendant's motion for compassionate release filed on July 10, 2020.[1] (Doc. 271). On July 24, 2020, the government timely filed a response requesting that the Court grant defendant's motion. (Doc. 274). On July 27, 2020, defendant timely filed a reply. (Doc. 275). For the following reasons, the Court **grants** defendant's motion.

## II.    RELEVANT BACKGROUND

Between mid-November 2011 and December 20, 2011, defendant and M.W. purchased methamphetamine from B.L., typically purchasing two or three 1/8th-ounce quantities each week. (Doc. 144, at 4). On December 20, 2011, defendant arrived at B.L.'s apartment in Aurelia, Iowa to repair one of B.L.'s vehicles. (*Id.*). B.L. asked defendant to drive to Mason City, Iowa to deliver a lockbox containing three ounces of methamphetamine to R.B., one of B.L.'s customers, in exchange for a 1/8th-ounce quantity of methamphetamine. (*Id.*, at 4–5). In addition to the methamphetamine he

---

[1] Defendant requests expedited relief in light of his health conditions and the spread of COVID-19 at his facility, discussed further below. (Doc. 271, at 1).

received in exchange for his services, defendant purchased more methamphetamine from B.L. for his and M.W.'s personal use. (*Id.*, at 4). Defendant met with R.B. in a cemetery near Rowan, Iowa, at which time R.B. removed the methamphetamine from the lockbox and replaced it with $6,000 in cash. (*Id.*, at 5). On the drive back from the transaction, defendant noticed he was being followed by law enforcement officers and, as a result, threw the methamphetamine he received as payment from B.L. out of the vehicle's window. (*Id.*). Officers conducted a traffic stop on defendant's vehicle in Dakota City, Iowa and defendant consented to a search. (*Id.*). Officers recovered the lockbox with $6,000 cash inside. (*Id.*). In addition, throughout mid to late 2011, defendant sold user amounts of methamphetamine to his neighbor. (*Id.*). Defendant sold methamphetamine throughout this time while on furlough from a residential correctional facility and, when he was not able to furlough, enlisted others to sell methamphetamine on his behalf. (*Id.*).

On February 23, 2012, a grand jury issued an Indictment charging defendant with one count of distribution of methamphetamine in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A). (Doc. 1). On February 29, 2012, officers arrested defendant. (Doc. 15). On March 1, 2012, defendant pleaded not guilty and was detained. (Doc. 19). On April 27, 2012, defendant changed his plea to guilty pursuant to a plea agreement with the government. (Docs. 84-1 & 94). On May 1, 2012, the Court accepted defendant's plea. (Doc. 104).

On June 27, 2012, the United States Probation Office ("USPO") filed defendant's final presentence investigation report. (Doc. 144). Defendant was, at that time, 53 years old and residing in Algona, Iowa, where he was also born. (*Id.*, at 2, 19). Aside from his father's alcohol abuse, defendant did not note any issues throughout his childhood. (*Id.*, at 19–20). Defendant had eight siblings, none of whom appeared to have criminal histories. (*Id.*, at 20). Defendant explained that his relationships with his siblings were "strained" and that he had to "reestablish trust" with them. (*Id.*). Defendant graduated

2

high school, earned a degree in auto body mechanics, and twice unsuccessfully enrolled in community college. (*Id.*, at 25). Despite holding steady employment earlier in his life, defendant's employment after 2005 was infrequent and ephemeral. (*Id.*, at 26–27). Defendant's marriage ended primarily because of his alcohol abuse which fueled altercations between him and his wife. (*Id.*). Defendant had three adult children who he described as happy, good, supportive, and concerned about his alcohol and marijuana abuse. (*Id.*, at 21). Defendant also had a girlfriend who was incarcerated on methamphetamine-related convictions. (*Id.*).

Defendant had ongoing issues with his right knee after it was shattered by a rock-crusher machine and later reinjured in a motorcycle accident. (*Id.*, at 21). Defendant asserted that he had a "respiratory condition" which involved "constant nasal drainage and a nearly constant sensation that he need[ed] to cough to clear his throat," which was later diagnosed as allergic rhinitis with history of gastroesophageal reflux disease. (*Id.*, at 22). Defendant also suffered an injury to his jaw and teeth after being punched in December 2011. (*Id.*). Defendant had undergone sex offender treatment and was diagnosed with generalized anxiety disorder and elements of antisocial personality disorder. (*Id.*, at 23). Defendant began drinking alcohol at age 15, began drinking approximately 12 beers per day at age 20, and stopped drinking at age 46. (*Id.*). Similarly, defendant used marijuana daily for decades but stopped at age 46. (*Id.*). Defendant began using methamphetamine at age 42 and gradually began using multiple times per week. (*Id.*, at 23–24). Defendant also abused cocaine, speed pill, white cross, LSD, and mushrooms in the past. (*Id.*, at 24). Defendant participated in substance abuse treatment multiple times, successfully completing at least four programs and regularly participating in both Alcoholics Anonymous and Narcotics Anonymous. (*Id.*, at 24–25).

Defendant's criminal history was significant. He had been convicted of, among other things, burglary twice, assaulting a police officer while participating in a felony,

3

operating while intoxicated three times, conspiracy to deliver marijuana, possession of marijuana, trespass, harassment, possession of anhydrous ammonia with intent to manufacture methamphetamine, contempt of court, violation of a no contact order, and possession of methamphetamine. (*Id.*, at 12–18). As to his harassment conviction, defendant prevented a woman from leaving a residence while threatening her and, thereafter, continued to threaten the woman and her daughter via phone. (*Id.*, at 15). Defendant later stole the woman's purse and dog. (*Id.*, at 17). Defendant frequently violated the terms of pretrial release and once absconded from supervision. (*Id.*, at 12–18). He generally performed well while on parole, but his probation was revoked at least once. (*Id.*, at 13–15). Prior to his instant term of incarceration, he had been incarcerated for a total of approximately 11.5 years, the longest single term being five years which immediately preceded the offense conduct here. (*Id.*, at 12–16).

On August 20, 2012, the Court sentenced defendant. (Doc. 170). Defendant was in criminal history category VI with a total offense level of 34, yielding an advisory guideline range of imprisonment of 262 to 327 months followed by eight years to life on supervised release. (Doc. 144, at 29). Defendant's prior convictions qualified him as a career offender. (*Id.*, at 32). Defendant requested a downward variance or departure because his career offender enhancement was based on "minor offenses." (Doc. 160). The Court ultimately reduced defendant's advisory guideline range. (Docs. 170 & 218, at 11). The Court sentenced defendant to 151 months' imprisonment followed by eight years on supervised release. (Doc. 174).

On June 25, 2015, the Court, on its own motion, found a reduction in defendant's sentence was not warranted in light of changes to the United States Sentencing Guidelines ("USSG"). (Doc. 237). On October 23, 2018, defendant filed a pro se motion to correct an error in the Judgment. (Doc. 262). On October 24, 2018, the Court denied defendant's motion. (Doc. 263). Defendant is currently incarcerated at FCI Milan with

4

a projected release date of November 18, 2021. *See Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the USSG section discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a

5

terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

### IV. DISCUSSION

#### A. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held that defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of
6

Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

On June 3, 2020, defendant, through counsel, submitted a request for release to the warden of his facility. (Doc. 271–5). Although receipt of the request was acknowledged by the BOP, defendant never received a response. (Doc. 271–1, at 5). Because 30 days have elapsed since defendant submitted his request to the warden, the Court finds he has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

### B. *Extraordinary and Compelling Reason*

Defendant argues an extraordinary and compelling reason for release is present because his age of 61 and recent breast cancer diagnosis put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 271–1, at 3–5). FCI Milan currently has five inmates and one staff person with active cases of COVID-19. *COVID-19*, BOP, https://www.bop.gov/coronavirus/. Three inmates have died, and more than a 150 inmates and staff persons have recovered. *Id.*

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases); *see also People Who are at Increased Risk for Severe Illness*, CDC, https://www.cdc.-gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html. The Centers for Disease Control and Prevention ("CDC") notes that older adults are at an increased risk of severe complications and death if exposed to COVID-19. *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults-.html. The CDC notes that risk increases with age, that eight out of ten deaths in the United States related to COVID-19 have been among persons over the age of 65, and that persons over age 85 are at the greatest risk. *Id.* The CDC also recognizes that persons

with cancer are at an increased risk. *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#cancer. Older adults with active, progressive forms of cancer are at particularly high risk. *See* Chris Dall, *Studies Highlight COVID-19 Impact on Cancer Patients*, Center for Infectious Disease Research and Policy, University of Minnesota (May 29, 2020).[2]

Defendant is 61 years old. (Doc. 144, at 2). Defendant was recently diagnosed with breast cancer, for which he underwent surgery on June 1, 2020. (Doc. 271–4, at 4). Defendant noted a lump in his breast on July 2019, but did not receive a biopsy until January 2020, at which time the lump was identified as malignant. (*Id.*, at 2). Although the lump was surgically removed six months later, post-surgical analysis showed defendant's cancer had metastasized to his lymph nodes. (*Id.*, at 4–5). Defendant will soon begin a chemotherapy regimen which will significantly reduce his white blood cell counts and thus hinder his immune system's ability to fight infections. *See* (*Id.*, at 1). Following chemotherapy, defendant has also been recommended to undergo radiation therapy, which will further reduce his ability to fight off infections. *See* (*Id.*). Defendant's oncologist as well as another doctor both agree defendant is at high risk of severe complications if he is exposed to COVID-19 due to his age, cancer diagnosis, and

---

[2] Defendant highlights that the CDC considers persons with compromised immune systems to be at an elevated risk during the pandemic. (Doc. 271–1, at 14). The CDC, after defendant filed his motion, updated its guidelines to explicitly recognize cancer as a category of increased risk and refined its immunocompromised risk category to refer to persons recovering from a solid organ transplant. *See People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. Other forms of immunocompromising treatments "may" but are not known to inherently increase a person's susceptibility to COVID-19. *Id.*

need for chemotherapy treatment. (Docs. 271–4, at 14; 271–9). One doctor expressed that "it is urgent [defendant] be released from prison to undergo his cancer treatment in a safer environment." (Doc. 271–9).

This Court and numerous other courts have found that serious, active cancer is a health condition which, amid the pandemic, presents an extraordinary and compelling reason for release. *See, e.g.*, *United States v. Brown*, No. 3:13-CR-14-TAV-HBG-2, 2020 U.S. Dist. LEXIS 114124, at *21 n.6 (E.D. Tenn. June 29, 2020) (noting an unreported case in the Southern District of Florida which granted release to a defendant with breast cancer receiving chemotherapy and radiation treatments); *United States v. Kelley*, No. 16-cr-00038-SI-1, 2020 U.S. Dist. LEXIS 96719 (N.D. Cal. June 2, 2020) (granting release to a 61-year-old defendant with prostate cancer); *United States v. Smith*, No. CR07-3038-LTS, 2020 U.S. Dist. LEXIS 95461 (N.D. Iowa June 1, 2020) (granting release to a defendant with lung cancer, COPD, and severe obesity); *United States v. Joling*, No. 6:11-cr-60131-AA, 6:15-cr-00113-AA, 2020 U.S. Dist. LEXIS 67953 (D. Or. Apr. 17, 2020) (granting release to a defendant with prostate cancer); *United States v. Smith*, No. 12-cr-122 (JFK), 2020 U.S. Dist. LEXIS 64371 (S.D.N.Y. Apr. 13, 2020) (granting release to a defendant with, among other things, bone marrow cancer); *United States v. Edwards*, No. 6:17-cr-00003, 2020 U.S. Dist. LEXIS 60095 (W.D. Va. Apr. 2, 2020) (granting release to a defendant with brain cancer whose chemotherapy compromised his immune system); *see also United States v. Beck*, 425 F. Supp. 3d 573 (N.C.M.D. June 28, 2019) (superseded on other grounds) (granting release prior to COVID-19 to a defendant with invasive breast cancer that had spread to her lymph nodes); *United States v. Schmitt*, No. CR-12-4076-LTS, 2020 U.S. Dist. LEXIS 2832 (N.D. Iowa Jan. 8, 2020) (noting, prior to COVID-19, that "district courts have granted compassionate release motions when defendants had advanced breast cancer or other types of advanced cancer").

9

Here, there is little question that defendant is at an elevated risk. Both his age and cancer diagnosis make him more susceptible to COVID-19. The treatment he requires to address his metastatic breast cancer will lower his immune system's ability to combat infections like COVID-19. Defendant's need for ongoing treatment will also lower his ability to self-isolate during the pandemic. Therefore, the presence of COVID-19 at FCI Milan presents a particular threat to this defendant.

Thus, the Court finds defendant has presented an extraordinary and compelling reason for release. The Court must still, however, consult the Section 3553(a) factors to determine if release is appropriate.

### C. *Section 3553(a) Factors and Danger to Community*

Defendant argues the Section 3553(a) factors favor release. (Doc. 271–1, at 17–19). Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Section 3582(c)(1)(A) requires a court to consider the factors set forth in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range as set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims.

It is highly aggravating that defendant committed the instant offense immediately after being released from a five-year term of incarceration for possession of anhydrous ammonia. It appears that, as soon as he was released, defendant began purchasing

methamphetamine from B.L. Defendant also sold methamphetamine independently. Notably, defendant continued to sell methamphetamine while in a reentry center and even recruited others to sell on his behalf. Defendant also threw methamphetamine out of the window of his vehicle when he was stopped by officers to avoid detection, although it appears he was otherwise cooperative. It is also mitigating, to some extent, that he agreed to transport methamphetamine for B.L. solely to support his own methamphetamine addiction. Aside from his father's alcohol abuse when he was a child, nothing in defendant's background explains his decision to involve himself in drugs and crime. At the time of sentencing, his lifestyle had strained his relationships with nearly all his family members despite many of them continuing to support him. His problems with addiction have consistently fueled his criminal history. Although defendant has at times been able to curb or control his addiction to some substances, his multiple attempts at drug treatment have not proven successful. Despite his age, the support of his family, access to drug treatment, and incrementally longer periods of incarceration, defendant has not been deterred from using drugs and engaging in criminal behavior.

Defendant has, however, performed well while incarcerated. He has not received any disciplinary reports during his eight years of incarceration. (Docs. 271–2). He successfully completed drug treatment, attended Alcoholic Anonymous and Narcotics Anonymous meetings, and took some education courses. (Doc. 271–3). Defendant also underwent training to serve as a suicide-watch companion for other inmates. (*Id.*). After accounting for good time credit, defendant has approximately only 16 months left of his term of imprisonment.

The circumstances of defendant's release are also promising. Defendant's sister Jan Capesius advises the Court that defendant "will have extensive family support" upon release to help defendant adjust to life outside of prison and address his medical needs. (Doc. 271–6, at 1). Ms. Capesius states that defendant "is committed to living a

11

productive life." (*Id.*, at 2). Defendant's son Mitch Fandel informs the Court that he has "seen a great change" in defendant, noting that defendant is now "honest with himself and others about his past and what led him to the mistakes that he made." (Doc. 271–7, at 1). Mr. Fandel states that his father is "clearly motivated to do better with his life." (*Id.*). Toby Welsh, a longtime family friend, states that he is willing to employ defendant, as he has in the past, and even provide defendant a free apartment for a limited period. (Doc. 271–8, at 1–2). Mr. Welsh also notes that defendant is at a point in his life when "making poor choices is no longer an option." (*Id.*). The outstanding character shown by defendants' family and friends in their letters reinforce that defendant will have the support needed to chart a new trajectory in his life upon release. By that same token, however, defendant will have little excuse should he fail to reform.

Although defendant's recidivist, drug-driven and sometimes violent criminal history is aggravating, the Court finds that release is appropriate under the Section 3553(a) factors, in light of defendant's health conditions during the pandemic, given his performance while incarcerated, completion of drug treatment, service of the majority of his term of incarceration, and promising release plan. The eight years of imprisonment defendant has already served has provided just punishment, promoted respect for the law, and offered adequate general deterrence. Defendant's performance while incarcerated and the comments from his family indicate he has changed for the better while incarcerated. Although there is a significant possibility defendant will return to the same criminal behavior despite the resources given to him, as he has in the past, his remaining eight-year term of supervised release will be sufficient to deter any residual danger he presents to the community and also provide a swift means of punishment should he recidivate.

## V. CONCLUSION

For these reasons, defendant's motion for compassionate release (Doc. 271) is **granted**. Defendant's sentence is **reduced** to **time served as of August 10, 2020**.[3] All other conditions of defendant's Judgment shall remain the same. (Doc. 174). The Clerk of Court is **directed** to provide a copy of this Order to the USPO and FCI Milan.

**IT IS SO ORDERED** this 27th day of July, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

---

[3] In its response, the government requests, on behalf of the BOP, that defendant be quarantined in FCI Milan for 14 days prior to his release to prevent the potential spread of COVID-19. (Doc. 274). In his reply, defendant notes he does not resist being quarantined prior to his release. (Doc. 275). He does request, however, that the Court order the BOP to provide defendant all treatment ordered by his oncologist or, in the alternative, that he be tested for COVID-19 and immediately released if found to be negative. (*Id.*). The Court does not have the authority to order the BOP to provide any specific treatment. Even if defendant could be tested and receive a result with haste, the Court also has no authority to order such testing. A two-week delay is reasonable in light of the need to prevent the spread of COVID-19 and to allow the USPO to prepare for defendant's supervision. Thus, the Court declines to order defendant's immediate release or direct the BOP to perform any specific medical functions.